

**ABID QURESHI**
+1 212.872.8027/fax: +1 212.872.1002
aqureshi@akingump.com

July 17, 2014

<u>**VIA HAND DELIVERY AND ECF**</u>

Hon. Christopher S. Sontchi
United States Bankruptcy Court
 for the District of Delaware
824 North Market Street, 5th Floor
Wilmington, Delaware 19801

     Re:    *In re Energy Future Holdings Corp. et al.,* Case No. 14-10979 (CSS), and *CSC Trust Co. of Delaware v. Energy Future Intermediate Holding Co. LLC et al.*, Adv. Proc. No. 14-50363

Dear Judge Sontchi:

       We represent the ad hoc committee of holders of 11.25%/12.25% unsecured senior toggle notes due December 1, 2018, issued pursuant to that certain indenture, dated December 5, 2012, by and among Energy Future Intermediate Holding Company LLC and EFIH Finance, Inc. (together, the "<u>EFIH Debtors</u>"), as issuers, and UMB Bank N.A., as successor trustee (the "<u>Ad Hoc Committee</u>").  We write in response to the letter (the "<u>Discovery Letter</u>") dated July 15, 2014 [Adv. Dkt. No. 80], from counsel to CSC Trust Company of Delaware, as successor indenture trustee (the "<u>10% Trustee</u>") for the holders of the 10% Senior Secured Notes Due 2020 (the "<u>10% Noteholders</u>" and the "<u>10% Notes</u>") issued by the EFIH Debtors, regarding certain discovery disputes relating to the Makewhole Litigation.[1]

       Reading the Discovery Letter in a vacuum and accepting the 10% Trustee's assertions at face value, one could get the impression that the Ad Hoc Committee has been somehow delinquent and refused to participate in the discovery process in connection with the Makewhole Litigation.  This is false.  The Ad Hoc Committee has fully complied with its discovery obligations and has produced all relevant, non-privileged documents in its custody and control to the 10% Trustee. What the Ad Hoc Committee has not done is search for and produce wholly irrelevant categories of documents, including its members' highly sensitive and proprietary valuation models and analyses, merely because the 10% Trustee has now demanded their production.  Hence this dispute.  As explained below, the additional categories of documents requested in the Discovery Letter are not relevant to any claim or defense at issue in the

---

[1] The "<u>Makewhole Litigation</u>" has the same definition used in the Discovery Letter.



Hon. Christopher S. Sontchi
July 17, 2014
Page 2

Makewhole Litigation, and the burden of searching for and producing them should not be thrust on the members of the Ad Hoc Committee.

### Discovery Already Provided by the Ad Hoc Committee

From the outset of these chapter 11 cases, the Ad Hoc Committee has been responsive and forthcoming with its discovery.  On May 8, 2014, the 10% Trustee requested broad discovery from the Ad Hoc Committee, including documents and negotiations related to the RSA[2], the First Lien DIP, the Second Lien DIP, and the Oncor TSA Amendment.

In response, counsel to the Ad Hoc Committee met and conferred with counsel to the 10% Trustee and agreed to produce **all** non-privileged, EFH-related communications between custodians from the Ad Hoc Committee and/or their legal and financial advisors, on the one hand, and any other party to the RSA ("RSA Party") and their legal and financial advisors, on the other hand, during the time period that the RSA and other agreements were being negotiated. The Ad Hoc Committee also produced non-privileged communications among certain of its individual members related to the RSA negotiations.

In total, the Ad Hoc Committee produced more than 3,600 documents totaling almost 20,000 pages.  The only communications withheld were those protected by the narrow common interest privilege between the EFIH Debtors and the Ad Hoc Committee related to analysis of the makewhole provisions (as discussed below).  The production included communications and negotiations related to the RSA, the First Lien DIP, the Second Lien DIP, the Oncor TSA Amendment, the Debtors' decision to file for bankruptcy, and the makewhole provision.

Additionally, the Ad Hoc Committee made Jeffrey Rosenbaum, an employee of one of the Ad Hoc Committee members, available for a deposition over the course of two days on June 25 and 26.  Multiple parties, including the 10% Trustee, questioned Mr. Rosenbaum on a number of topics, including the negotiations leading up to the EFIH Debtors' bankruptcy filing.

### The Current Discovery Dispute

In the Discovery Letter, the 10% Trustee now seeks production of massive amounts of additional material from the Ad Hoc Committee, including two broad categories of documents and additional search parameters.  The 10% Trustee demands: (1) the members' communications and analyses regarding the value of the EFIH Debtors, including the members' proprietary

---

[2] "RSA" refers to the Restructuring Support and Lock-Up Agreement, dated as of April 29, 2014, attached as Exhibit 1 to Exhibit A of the RSA Assumption Motion at Docket No. 505.



Hon. Christopher S. Sontchi
July 17, 2014
Page 3

models; (2) the members' documents related to the EFIH Debtors' bankruptcy filing, the RSA, and the repayment of the 10% Notes; (3) purely internal communications regarding 1 and 2; (4) documents pre-dating January 2014; and (5) Bloomberg instant messages and other unidentified forms of electronic communication.  The 10% Trustee also challenges the Ad Hoc Committee's assertion of a narrow common interest with the Debtors regarding the enforceability of the makewhole provision.[3]  Additionally, on June 18, 2014, the 10% Trustee served 13 separate deposition subpoenas on the individual members of the Ad Hoc Committee, certain of their employees, and one of the Ad Hoc Committee's financial advisors, in relation to the Makewhole Litigation.

As explained below, the 10% Trustee is not entitled to the additional discovery it now demands.

## ARGUMENT

Discovery is not limitless.  Before the 10% Trustee is entitled to additional discovery beyond the production already made by the Ad Hoc Committee, it must satisfy the threshold requirement that the information it seeks is relevant or reasonably calculated to lead to the discovery of admissible evidence.  *See* FED. R. CIV. P. 26 (b)(1); *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351-52 (1978) ("Discovery of matter not 'reasonably calculated to lead to the discovery of admissible evidence' is not within the scope of Rule 26(b)(1).").

Even where discovery is arguably relevant, FED. R. CIV. P. 26(c) provides, "[t]he court may, for good cause, issue an order" forbidding or limiting discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  FED. R. CIV. P. 26(c).  Similarly, FED. R. CIV. P. 45(c)(3)(A)(iv) provides that "the court . . . must quash or modify a subpoena that . . . subjects a person to undue burden."  In evaluating whether a subpoena imposes an undue burden, courts consider factors such as the relevance of the discovery sought as well as the need of the party for the discovery requested.  *See Konstantopoulos v. Westvaco Corp.*, No. 05-165, 1991 WL 269606, at *2–3 (D. Del. Dec. 13, 1991); *Royal Indem. Co. v. Pepper Hamilton LLP*, No. 90-146, 2006 WL 3827452, at *2 (D. Del. Dec. 27, 2006) (citation omitted).

---

[3] The identical issues were previously before the Court.  On June 23, 2014, the 10% Trustee submitted to the Court a letter brief seeking to compel production of the same documents.  The Ad Hoc Committee responded on June 25, 2014.  On June 26, 2014—the eve of the telephonic hearing to address these issues—counsel to the 10% Trustee voluntarily withdrew its letter brief.  Now the 10% Trustee has filed a second letter brief, seeking to compel production of the same categories of documents, and asserting the same common interest challenge, that the Ad Hoc Committee was prepared to address with the Court weeks ago.



Hon. Christopher S. Sontchi
July 17, 2014
Page 4

## I.    The Additional Discovery Sought by the 10% Trustee is Not Relevant

As described below, none of the additional categories or types of documents sought by the 10% Trustee are relevant to the claims or defenses at issue in the Makewhole Litigation. Likewise, the 13 depositions sought by the 10% Trustee are not targeted to yield relevant, admissible information for use in the Makewhole Litigation.

### A.    The Ad Hoc Committee's Documents Related to Solvency or the Debtors' Bankruptcy Filing Are Not Relevant

In the Discovery Letter, the 10% Trustee lists seven categories of documents, related to two main issues—the EFIH Debtors' solvency and the EFIH Debtors' motivation in filing for bankruptcy—that it claims the Ad Hoc Committee has refused to produce on the basis of relevance.  Discovery Letter at 7.  This is false.  As the Ad Hoc Committee has made clear previously to the 10% Trustee, the Ad Hoc Committee has produced documents related to several of these categories in connection with the 10% Trustee's initial requests.  *See* Exhibit A to Discovery Letter at Exhibit D (Ad Hoc Committee Responses and Objections).

What the 10% Trustee really demands is more discovery from the Ad Hoc Committee on those issues, including communications with unidentified third parties and purely internal communications and analysis.  Discovery Letter at 7-8.  The Ad Hoc Committee has refused, because these documents are not relevant to the dispute before the Court.

1.    <u>The 10% Trustee is Not Entitled to Additional Discovery Regarding the EFIH Debtors' Solvency or Valuation</u>

The Ad Hoc Committee has not taken, and does not intend to take, a position on the EFIH Debtors' solvency or valuation in connection with the Makewhole Litigation, and will not offer expert or other evidence on the topic.  The internal communications of the Ad Hoc Committee's members regarding valuation, or their proprietary valuation models, are thus of no relevance in this litigation.[4]

Two recent decisions on this issue, *In re Genco* and *In re Dolan*, are informative.  In *Dolan* and *Genco*, Judge Shannon of the Bankruptcy Court for the District of Delaware and Judge Lane of the Bankruptcy Court for the Southern District of New York, respectively, considered whether a creditor's internal analysis of a debtor's value is discoverable in connection

---

[4] Moreover, from a policy standpoint, the potential chilling effect of requiring RSA participants to produce highly sensitive internal valuation information, even if they have not placed valuation at issue, is obvious.



Hon. Christopher S. Sontchi
July 17, 2014
Page 5

with a valuation dispute.  *See* Transcript Regarding Hearing Held May 2, 2014, *In re The Dolan Co.*, 14-10614 (Bankr. D. Del. May 2, 2014) ECF No. 284 before the Honorable Brendan L. Shannon ("*Dolan* Hearing Tr.*"*), attached hereto as Exhibit 1; Transcript Regarding Hearing Held June 2, 2014, *In re Genco Shipping & Trading*, No. 14-11108 (Bankr. S.D.N.Y. June 3, 2014) ECF No. 336 before Honorable Sean H. Lane ("*Genco* Hearing Tr.*"*), attached hereto as Exhibit 2.

In *Dolan*, an equity committee sought discovery from a secured creditor and RSA party regarding the creditor's internal valuation analyses, arguing that the creditor "may well have in their files valuation materials that can contradict [the plan value that] has been presented to the Court, or otherwise provide information that will be useful in analyzing and critiquing that valuation."  *See Dolan* Hearing Tr. (Exhibit 1) at 9:16-19, 12:2-5.  Judge Shannon rejected this argument and held that, as a general proposition, a creditor's valuation of a debtor is not "an appropriate area of inquiry" and is "of limited relevance."  *Id*. at 19:13-16, 20:3-5; *see also id*. at 21:25-22:3 ("I think I have, in a number of instances, consistently held that this type of inquiry is not appropriate until and unless [the lender] becomes an active participant in presenting evidence and testimony to the Court regarding the value of the company.").

In *Genco*, an equity committee sought discovery from a creditor and RSA party regarding that creditor's internal valuations that were not shared with other parties.  *See Genco* Hearing Tr. (Exhibit 2) at 19:19-20:11, 32:13-33:14.  Judge Lane denied the equity committee's request for internal valuation discovery, noting various problems with seeking internal valuation discovery from a creditor, who despite being an RSA party, "is not going to be presenting evidence on valuation at the trial."  *Genco* Hearing Tr. at 60:20-21.  Judge Lane found an important distinction between parties who only participate in "briefing and legal argument" and those that offer their own valuation evidence.  *Id.* at 62:20-63:10.  Where a party does not offer its own evidence, and the internal valuations sought were not shared with other parties, Judge Lane held such evidence is "of limited relevance" because the burden rests "with the debtor on the value of the company."  Judge Lane also noted the potential problems of "opening the floodgates" to valuation evidence where multiple subjective views are presented and in requiring the production of sensitive, proprietary business information from creditors.  *Id.* at 61:2-13, 62:7-13.

Finally, the cases relied on by the 10% Trustee are inapposite or otherwise distinguishable.  For example, contrary to the 10% Trustee's representations, the court in *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007), did not address the question of whether the subjective views of "sophisticated market participants" are probative of valuation.  On the contrary, the court focused on trading prices in an efficient market as a potentially valid indicator of value.  *See Campbell Soup Co.*, 482 F.3d at 629, 631.  The remainder of the 10% Trustee's



Hon. Christopher S. Sontchi
July 17, 2014
Page 6

authority is equally unavailing. *See In re Plassein Int'l Corp.*, No. 03-51472, 2008 WL
1990315, at *8-10 (Bankr. D. Del. May 5, 2008) (in connection with fraudulent transfer solvency
analysis regarding unreasonably small capital, court considered expert testimony concerning the
reasonableness of management's projections at the time of the transfer); *In re Longview
Aluminum LLC*, No. 03-12184, 2005 WL 3021173, at *7 (Bankr. N.D. Ill. July 14, 2005) (same);
*U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, No. 10-1842, 2013 WL 230329, at *8-14 (N.D.
Tex. Jan. 22, 2013) (considering three private investors' views of value at a specific point in time
to determine whether market was misled as to company's true value, and holding that because
market was not misled, company's stock price in an efficient market was reliable indicator of
value); *In re Iridium Operating LLC*, 373 B.R. 283, 332 (Bankr. S.D.N.Y. 2007) (court did "not
accept [investment banker] valuations as true" and described such valuations as "anecdotal
information that does not prove solvency or establish enterprise value").

Notably, even in the cases that the 10% Trustee relies on to argue that the EFIH Debtors'
valuation or solvency is relevant to the Makewhole Litigation, the courts did not consider
evidence of individual creditors' internal, subjective valuation models. *See In re Premier Entm't
Biloxi LLC*, 445 B.R. 582, 638 (Bankr. S.D. Miss. 2010) (claimants' evidence limited to
schedules filed by the debtors, the proposed plan (which contemplated a 100% recovery for
general unsecured creditors and the shareholders' retention of equity), the debtors' audited
financial statements, and expert testimony); *In re Chemtura Corp.*, 439 B.R. 561, 569, 572-73
(Bankr. S.D.N.Y. 2010) (as a result of settlements of various liabilities, parties agreed that debtor
was solvent; valuation evidence presented through expert analyses); *Gencarelli v. UPS Capital
Bus. Credit*, 501 F.3d 1, 3, 5 (1st Cir. 2007) (court determined solvency based on debtors' sale of
assets resulting in multimillion dollar surplus).

Here, if the EFIH Debtors' valuation or solvency is relevant to the Makewhole Litigation,
the 10% Trustee has already gotten evidence from the EFIH Debtors themselves and can offer
expert testimony of its own.  The 10% Trustee does not need—and is not entitled to—discovery
of the internal valuation models or analyses of the members of the Ad Hoc Committee,
particularly here, where the Ad Hoc Committee is not taking a position or offering evidence on
solvency.

      2.    <u>The 10% Trustee is Not Entitled to Additional Discovery from the Ad Hoc
Committee Regarding the EFIH Debtors' Intent in Filing for Bankruptcy</u>

The 10% Trustee also demands production of documents (1) regarding the EFIH Debtors'
motivations in filing for bankruptcy, (2) relating to the RSA, and (3) regarding the decision to
repay the 10% Notes.  Discovery Letter at 6.  As described above, the Ad Hoc Committee has



Hon. Christopher S. Sontchi
July 17, 2014
Page 7

already produced its communications with the RSA Parties and their advisors from January 28, 2014 through April 29, 2014, regarding these negotiations.

With respect to non-RSA Parties, even if the EFIH Debtors' subjective reasons for filing for bankruptcy are relevant, that is a Debtor-specific inquiry. The EFIH Debtors decided to file for bankruptcy. The members of the Ad Hoc Committee, who are neither employees nor agents of the EFIH Debtors, cannot offer relevant testimony or evidence about why the EFIH Debtors made their decisions. The members' separate communications—even if there exist communications about why the members of the Ad Hoc Committee *thought* the EFIH Debtors should file for bankruptcy—are not probative of the EFIH Debtors' intent and reasons for entering into bankruptcy.

Moreover, the 10% Trustee can obtain, and has obtained, discovery directly from the EFIH Debtors regarding their decision in filing for bankruptcy. For example, counsel to the 10% Trustee participated in depositions of several of the EFIH Debtors' officers and directors, and we understand that the EFIH Debtors have produced thousands of documents on these issues.

**B.      Purely Internal Communications, Bloomberg Messages, and Pre-2014 Documents Are Not Relevant**

As discussed above, the Ad Hoc Committee produced to the 10% Trustee e-mail communications from the Ad Hoc Committee for the period January 28, 2014 to April 29, 2014 regarding the negotiations that led to the RSA and the other transactions contemplated therein, such as the First Lien DIP, Second Lien DIP, and Oncor TSA Amendment. Now the 10% Trustee demands that the Ad Hoc Committee search additional sources, using additional parameters, to produce additional documents.

With respect to purely internal communications among the individual Committee members related to solvency or the EFIH Debtors' motivations in filing for bankruptcy, those communications are irrelevant for the reasons stated above.

With respect to pre-2014 documents, the record is clear that the parties began negotiating the terms of the RSA—including the First Lien DIP and Settlement—in January 2014. *See* June 30, 2014 Hearing Tr., excerpt attached as Exhibit 3, at 158:10-14 (Ying: "My recollection that the discussions between the company, the EFIH unsecureds, Fidelity and the shareholders of EFH started in late January, early February, and they remained extremely active up until the eve of the filing date). Searching documents from a year earlier makes little sense.



And with respect to Bloomberg messages, during his deposition Mr. Rosenbaum made clear that the negotiation of these agreements took place over e-mail, telephone, and in meetings. *See* Rosenbaum 6/26/14 Dep. Tr. at 348:20-349:12, excerpt attached as Exhibit 4.  Searching for secondary modes of communication is an unnecessary burden and a waste of resources, given the wealth of information available elsewhere and in the production to date.

### C.      The 10% Trustee's Deposition Subpoenas Served on the Members of the Ad Hoc Committee Constitute an Undue Burden

In addition to the categories of documents described above, the 10% Trustee served 13 deposition subpoenas on the individual members of the Ad Hoc Committee and their employees, twice as many as the 10% Trustee served on the Debtors.  Significantly, the 10% Trustee did not serve a 30(b)(6) subpoena on the Ad Hoc Committee—the actual intervenor in the Makewhole Litigation—opting instead to target the individual financial institutions that comprise the Ad Hoc Committee.  The 10% Trustee is not entitled to these depositions of non-parties.[5]

First, for the reasons articulated above, the individual members of the Ad Hoc Committee do not have relevant evidence to provide in connection with the Makewhole Litigation.  The members of the Ad Hoc Committee were not parties to the negotiations of the First Lien Indenture.  Their subjective, internal discussions and analysis regarding the value of the EFIH Debtors are not relevant to the objective question of the EFIH Debtors' solvency.

Second, FED. R. CIV. P. 30 limits the number of potential depositions to 10.  FED. R. CIV. P. 30(a)(2)(A)(i).  Thus, the 13 deposition notices here are *per se* excessive and must be limited. *See Nesselrotte v. Allegheny Energy, Inc.*, No. 06-01390, 2008 WL 1925107, at *2 (W.D. Pa. Apr. 30, 2008).

Third, the members of the Ad Hoc Committee have little, if any, relevant evidence to provide regarding the EFIH Debtors' motivation in filing for bankruptcy.  That is a subjective inquiry, and the parties in the best position to provide the Court with relevant information are the EFIH Debtors and their advisors.  The members of the Ad Hoc Committee cannot speak to the EFIH Debtors' subjective motivations.  Where, as here, deposition requests are duplicative,

---

[5] The 10% Trustee's assertion that the Ad Hoc Committee previously agreed to produce its members for depositions in connection with the Makewhole Litigation is nonsense.  On at least three occasions, including in the very e-mail relied on by the 10% Trustee, counsel to the Ad Hoc Committee reserved its right to move to quash the deposition subpoenas.  *See* Exhibit A to Discovery Letter at Exhibit F (June 20, 2014 Letter from Ad Hoc Committee to 10% Trustee; June 26, 2014 e-mail from Robert Boller to Warren Usatine, attached as Exhibit 5; Exhibit J to Discovery Letter (July 5, 2014 e-mail from Robert Boller to Warren Usatine).



Hon. Christopher S. Sontchi
July 17, 2014
Page 9

cumulative, and there are more convenient ways of obtaining the discovery, a court "*must* limit the frequency or extent of discovery" sought. FED. R. CIV. P. 26 (emphasis added); *Konstantopoulos*, 1991 WL 269606 at *2–3, *Traynor v. Liu*, 495 F. Supp. 2d 444, 451–52 (D. Del. 2007).

Finally, the party that intervened in the Makewhole Litigation was the Ad Hoc Committee, not its individual members. To resolve this dispute and satisfy the 10% Trustee, the Ad Hoc Committee is prepared to offer a 30(b)(6) witness to testify on behalf of the group with respect to the Ad Hoc Committee's knowledge of the issues of concern to the 10% Trustee.

## II.     The Ad Hoc Committee Asserted a Narrow and Well-Defined Common Interest Privilege with the EFIH Debtors

Once again, the 10% Trustee mischaracterizes the common interest privilege asserted by the Ad Hoc Committee and the EFIH Debtors as a broad, "blanket" assertion of privilege. Discovery Letter at 12. This is false. As the Ad Hoc Committee has repeatedly explained, it has asserted only a narrow prepetition common interest with the EFIH Debtors and their advisors, limited to the legal analysis of the makewhole provisions in the First Lien Indenture and the Second Lien Indenture and the legal strategy in connection with anticipated litigation regarding the applicability of those makewhole provisions. The EFIH Debtors and the Ad Hoc Committee share a common legal interest regarding the question of the makewhole provisions' applicability, and that common legal interest existed well before the bankruptcy when the parties anticipated litigating this issue in the future. On the basis of this common interest, the Ad Hoc Committee has withheld a handful of communications with the Debtors' advisors discussing these topics.[6]

The 10% Trustee suggests that the EFIH Debtors and the Ad Hoc Committee do not share a common legal interest and therefore the withheld documents must be produced. Discovery Letter at 12-13. This Court's opinion in *In re Leslie Controls, Inc.*, 437 B.R. 493 (Bankr. D. Del. 2010) (Sontchi, J.), which the 10% Trustee cites throughout this section of its letter, establishes otherwise. In *Leslie Controls*, a debtor shared with an ad hoc committee of asbestos plaintiffs and with a representative of future claimants certain privileged documents containing the legal advice of the debtor's insurance coverage counsel. Later, in the context of a coverage dispute with the debtor's insurer, the three asserted a common interest as the basis for withholding the documents form the insurer. *Id.* at 495, 497. The withholding parties argued that the privileged documents were protected from discovery on the basis of the common interest privilege, and asserted a common legal interest in "preserv[ing] and maximiz[ing] the insurance

---

[6] The Ad Hoc Committee has agreed to provide the 10% Trustee with a log of these withheld documents.



Hon. Christopher S. Sontchi
July 17, 2014
Page 10

available to pay asbestos claims." *Id.* at 500 (internal quotations omitted).  This Court found that the common interest among the three parties concerned "an inherently legal question" because it "involve[d] an analysis of the insurance documents, as well as contract, insurance and bankruptcy law," "require[d] the involvement of the bankruptcy court," and all parties shared a common goal "working with the Debtors to maximize the size of the pie."  *Id.*  As in *Leslie Controls*, here the Ad Hoc Committee and the EFIH Debtors share a common legal interest regarding the analysis of an indenture that involves questions of contract and bankruptcy law, will require the involvement of this Court, and both parties are working to maximize the size of the pie for the EFIH Debtors' unsecured creditors.

         Moreover, *Leslie Controls* also rebuts the 10% Trustee's argument that the common interest between the Ad Hoc Committee and the EFIH Debtors could not exist prior to execution of the RSA.  Discovery Letter at 12.  As this Court held in *Leslie Controls*, the mere fact that parties engage in ongoing plan negotiations and have certain differing interests does not preclude a common interest on specific topics and does mean that they share no common legal interest in maximizing the value of the debtor's estate.  *Leslie Controls*, 437 B.R. at 502; *see also In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007) ("In the community of interest context . . . because the clients have separate attorneys, courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer."); *In re Tribune Co.*, No. 08-13141, 2011 WL 386827, at *4 (Bankr. D. Del. Feb. 3, 2011) (holding that the common interest privilege "can apply to parties whose interests are not totally in accord").  Here, although the Ad Hoc Committee and the EFIH Debtors were engaged in prepetition RSA negotiations, they shared a common interest in maximizing the value of the EFIH Debtors' estates, including by challenging non-meritorious claims such as the makewhole claim being asserted here against the EFIH Debtors.  Their common interest on this narrow point did not require execution of the RSA.

                             Respectfully submitted,


                             */s/ Abid Qureshi*


                             Abid Qureshi

Cc:    Philip Anker, Esq.
          E-Filing Distribution List